Commonwealth, Appellant, *v.* First National Bank and Trust Company of Easton.

Argued January 12, 1931. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SADLER, SCHAFFER and MAXEY, JJ.

*Harold D. Saylor,* Deputy Attorney General, with him *William A. Schnader,* Attorney General, for appellant. —The consolidation of the trust company with the national bank did not result in a merger of the charters of the two corporations, as an Act of Congress cannot effect the dissolution of a state charter in the absence of a state act so providing: Buist's Est., 297 Pa. 537; York Haven Water & Power Co. v. Pub. Ser. Com., 87

Pa. Superior Ct. 213; Worcester Co. Nat. Bank's Petition, 162 N. E. 217; Taylor v. Holmes, 14 Fed. 498.

It was not the intent, purpose or effect of the Act of Congress of November 7, 1918, as amended by the Act of February 25, 1927, to merge the charter of a state trust company with that of a national bank, and the provisions of the Act of 1927 preclude such a merger: Worcester Co. Nat. Bank, 279 U. S. 347.

The charter of the Northampton Trust Company is still in existence and may be dissolved by decree of the Court of Common Pleas of Northampton County.

*H. J. Steele,* with him *Robert W. Bowley,* for appellee, cited: Minneapolis v. Gardner, 177 U. S. 332; Keokuk v. Missouri, 152 U. S. 301; Lauman v. R. R., 30 Pa. 42; Petry v. Electric Co., 280 Pa. 142; Bank v. Dearing, 91 U. S. 29; R. R. Co. v. Georgia, 98 U. S. 359.

OPINION BY MR. JUSTICE MAXEY, March 16, 1931:

The First National Bank and Trust Company of Easton is a consolidated banking corporation established in accordance with the Act of Congress of November 7, 1918, chapter 209, 40 Stat. at L. 1044, as amended by Act of February 25, 1927, chapter 91, 44 Stat. at L. 1224, 12 U. S. C. A., section 34 a. The Northampton Trust Company and First National Bank of Easton constitute the consolidated bank. The Northampton Trust Company, of Easton, Pa., was incorporated in 1902 under the provisions of the Act of the Pennsylvania Assembly of April 29, 1874, P. L. 73, and the supplements thereto. It acquired trust company powers by accepting the provisions of the Act of May 9, 1889, P. L. 159. The First National Bank, of Easton, Pa., was, as its name indicates, a chartered national bank. The consolidation of these two institutions was made under the charter of the national bank on July 1, 1929, at which time the consolidated corporation took the title of the First National Bank and Trust Company.

On the latter date the national comptroller of the currency issued his certificate of approval.

To carry out the consolidation, all of the stock of the Northampton Trust Company was surrendered and new certificates of stock of the First National Bank and Trust Company of Easton were issued therefor. All the assets and property of the trust company were transferred to the bank and trust company, and the trust company ceased to transact business. Thereafter the commissioner of banking of Pennsylvania directed the trust company to petition the Court of Common Pleas of Northampton County, under the provisions of the Act of April 9, 1856, P. L. 293, for a decree of dissolution. The bank and trust company entered into these proceedings as respondent, filed its demurrer to the petition, assigning, inter alia, that the contract of consolidation worked a dissolution of the trust company and that the effect of the Act of Congress of February 25, 1927, was to extinguish the trust company and that therefore the court had "no jurisdiction of the said petition." The court took this view and dismissed the petition. The Commonwealth of Pennsylvania obtained leave to intervene as a party-petitioner and to file exceptions to the decree.

The Commonwealth contends: "(a) That the consolidation of the trust company with the national bank did not result in a merger of the charters of the two corporations, as an Act of Congress could not effect the dissolution of a state charter in the absence of a state act so providing; (b) that it was not the intent, purpose or effect of the Act of Congress of November 7, 1918, as amended by the Act of February 25, 1927, to merge the charter of a state trust company with that of a national bank, and that the provisions of the Act of 1927 preclude such a merger; and (c) that the charter of the Northampton Trust Company is still.in existence, and the corporation may be dissolved by decree of the Court of Common Pleas of Northampton County."

We accept these propositions. Section 3 of the Act of February 25, 1927, chapter 91, 44 Stat. at L. 1224, 1225 (12 U. S. C. A., section 34 a), which authorizes any bank, trust company, savings bank, or other banking institution incorporated under the laws of any state to be consolidated directly with a national bank located in the same county, city, town or village under the charter of such national bank, provides in part that when such consolidation is effected: "......all the rights, franchises, and interests of such state or district bank so consolidated with a national banking association, in and to every species of property, real, personal and mixed, and choses of action thereto belonging shall be deemed to be transferred to and vested in such national banking association into which it is consolidated, without any deed or other transfer, and the said consolidated national banking association shall hold and enjoy the same and all rights of property, franchises and interests, including the right of succession as trustee, executor, or in any other fiduciary capacity, in the same manner and to the same extent as was held and enjoyed by such state or district bank so consolidated with such national banking association...... No such consolidation shall be in contravention of the laws of the state under which such bank is incorporated."

There is no law in Pennsylvania which prevents or forbids such consolidation; neither is there any Pennsylvania legislation which recognizes such a consolidation as working a dissolution of the Pennsylvania corporation which is in the consolidation. The Act of April 9, 1856, P. L. 293, provides a method by which a charter of a corporation created by this Commonwealth may be dissolved. It is a corollary of this that only by obedience to the prescriptions of this act can a corporation called into being by Pennsylvania be dissolved. Chief Justice MARSHALL, in McCulloch v. Maryland et al., 4 Wheat. 367, said: "The creation of a corporation...... appertains to sovereignty. This is admitted. But to

what particular sovereignty does it appertain? Does it belong to one more than to another? In the United, States, the powers of sovereignty are divided between the government of the union, and those of the states. They are each sovereign with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other."

Article X of the federal Constitution provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." The United States government has no powers except those "expressly given, or given by necessary implication." MARSHALL, Chief Justice, in Martin v. Hunter's Lessee, 1 Wheat. 304, 326, 4 L. edition 97, 103. The respective supremacies of the state and national government in their respective spheres of sovereignty have been meticulously observed by the nation and each individual state. Within their individual spheres they are as sovereign as if they were two independent foreign states. There are many governmental activities in respect to which the federal government is not the states' superior or sovereign. McLEAN, J., in License Cases, 5 How. 504, 588, 12 L. edition 256, 293, says: "The powers of the general government and of the state, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres."

The United States creates national banks and is their sovereign. Pennsylvania creates its own state banks and is their sovereign. The United States has no power to create or destroy Pennsylvania corporations. They can be destroyed only by Pennsylvania or with her consent. A corporation's activities may be suspended by a resigantion of all its officers, but this would not effect a dissolution of the corporation any more than would the death or resignation of all the judges of a court dis-

solve that court. Corporations, like individuals, may be in a state of suspended animation. When the chief executive of the nation dies, the presidency is not ended or dissolved even during the interval before a new president is sworn in.

It is well argued by the attorney general for the Commonwealth that "it was not the intent, purpose or effect of the Act of Congress of November 7, 1918, as amended by the Act of February 25, 1927, to merge the charter of a trust company with that of a national bank, and the provisions of the Act of 1927 preclude such a merger." We agree with these conclusions. They are in harmony with the conclusion reached by the supreme judicial court of Massachusetts in the case of Petition of Worcester Co. Nat. Bank, 162 N. E. 217 (Massachusetts, 1928), where RUGG, C. J., in interpreting the Act of Congress, said: "The later provisions of said section 3 that there shall be transferred to the national banking association and be held by it, among other things, the 'franchise' of the state bank, cannot mean its right to be a corporation. The right to transfer franchise powers of a corporation organized under the laws of one sovereignty to a corporation organized under the laws of a different sovereignty is extraordinary. It cannot be implied, in the absence of explicit statutory enactment to that end. There is no such provision in the statutes of this Commonwealth. Any other conclusion would be in contravention of the laws of this Commonwealth." That finding was affirmed by the Supreme Court of the United States in 279 U. S. 347, 73 L. edition 733. In that case Chief Justice TAFT said: "It held that the word 'franchises' directed to be transferred to the national bank by virtue of section 3 did not mean its charter or its right to be a corporation, for that would be in contravention of the law of the Commonwealth......" and then added: "These views lead us to agree with the conclusions of the supreme judicial court in respect to the legality of the consolidation of the trust company

with the national bank...... We think section 3 en-
joins upon the national bank complete conformity with
the Massachusetts law in its conduct of estates of de-
ceased persons when acting as trustee or administrator
thereof."

The situation in this case is analagous to that of a
state bank or trust company organized under state laws
converting itself into a national bank under section
5154, U. S. Revised Statutes, as amended by section 8
of the Federal Reserve Act. Such conversion of a state
bank does not dissolve the state corporation. It is
merely a change of title and governmental supervision.
In the case of Michigan Ins. Co. v. Eldred, 143 U. S.
293, the appellee there, like the appellee here, took the
position that "the logical effect of the decisions and of
the Act of Congress (Revised Statutes, section 5154)
would seem to be, upon the conversion of a state bank
into a national bank, all of its property, rights, priv-
ileges and franchises, including its corporate existence,
would pass to and be merged in the national bank. What
necessity is there for, and how could the state bank ex-
ist after it had been stripped of, all its property, rights
and franchises? If it still could exist as a state corpo-
ration for any purpose, it would still be under the con-
trol of the state, which is obnoxious and repugnant to
the authority exercised by Congress over national banks.
The Act of Congress certainly does not contemplate the
existence of two banks after the conversion. Hence, the
state bank must cease to exist for all purposes." The
Supreme Court of the United States, speaking through
Mr. Justice GRAY, said: "The evidence offered by the
defendant on this point wholly failed to support this de-
fense, and at most only proved that the plaintiff sued by
the wrong name. It showed no more than that the plain-
tiff corporation, having been originally created by the
laws of Michigan, had, in accordance with the National
Banking Act, become a national bank, and its name been
changed accordingly, without affecting its identity, or

its right to sue upon obligations or liabilities incurred to it by its former name."

In the case of Metropolitan Nat. Bank v. Claggert, 141 U. S. 520, the Supreme Court said, at page 527: "The question we are to consider here is, did the court err in holding that the plaintiff in error was not exonerated from liability either by its becoming a national bank or by the proceedings for the redemption and retirement of its circulating bills issued whilst a state bank, which proceedings, it was claimed, were in strict observance of every requirement of the New York Statute of 1859 in relation thereto, or by the statute of limitations of the State of New York? The court decided that the New York Statute providing for a redemption of circulating notes and for releasing the bank, if the notes were not presented in six years, applied alone to banks 'closing the business of banking'; that the change or conversion of the Metropolitan Bank into the Metropolitan National Bank did not 'close its business of banking' nor destroy its identity or its corporate existence, but simply resulted in a continuation of the same body with the same officers and stockholders, the same property, assets and banking business under a changed jurisdiction; that it remained one and the same bank, and went on doing business uninterruptedly...... The decision is so manifestly correct that it needs no argument to sustain it."

Appellee brings to our attention the case of Shields v. Ohio, 95 U. S. 319. That case held that a consolidation, pursuant to the statute of Ohio of April 10, 1856, of two or more railway companies worked a dissolution. When it is observed that the corporations affected by the Ohio statute were both Ohio corporations the distinction between that case and this is obvious.

Keokuk v. Missouri, 152 U. S. 301, is also cited. In that case a Missouri railroad company consolidated with an Iowa company under a general law of Missouri authorizing any railroad of Missouri to consolidate with

a railroad company of an adjoining state "making one company of the two." Here, therefore, the sovereign State of Missouri consented to the consolidation of its corporation with an outside corporation, the consent being given by its general law. Pennsylvania gave no such consent in the case before us.

The case of Dakota Central Telephone Co. et al. v. South Dakota ex rel. Payne, 250 U. S. 163, is not in point. That case did not involve the question of the dissolution of a state corporation but of the power of a state to fix rates to be charged for intrastate transmission of telephone messages on lines taken over by the United States as a war measure. In Northern Pacific Ry. Co. et al. v. North Dakota, 250 U. S. 135, a similar question was presented in respect to rates on intrastate traffic on a railroad taken over by the government as a war measure. There was no attempt to dissolve a state corporation by an Act of Congress, or by administrative acts pursuant thereto.

The case of First National Bank of Bay City v. Fellows, Attorney General, 244 U. S. 416, held that the circumstance that a function is of a class subject to state regulation does not prevent Congress from authorizing a national bank to exercise it; nor would it lie within the state power to forbid this. The principle underlying that decision was that the power to create a national bank carried with it the power to clothe that bank with functions necessary, in the judgment of Congress, to make the business of the bank successful. The Supreme Court of the United States did not decide in that case that Congress had the power to dissolve state corporations; it decided that when Congress creates a national bank it creates it fully panoplied with all banking power.

The fundamental reason why the court below sustained the demurrer to the petition for dissolution is found in the tenth "cause of demurrer" which, with others related thereto, the court "allowed," and which reads as follows: "The said trust company having been

extinguished under the agreement of consolidation, and its approval by the comptroller of the currency, there is no authority to dissolve an already dead corporation." We cannot agree that the corporation whose dissolution was petitioned for was "already dead." Even though it was in a condition of suspended animation by reason of the consolidation with the First National Bank and Trust Company of Easton, it was not, in contemplation of the sovereign State of Pennsylvania, legally dead, and it would be derogatory to the rights and dignity of this sovereign state for her courts to hold that an Act of the Congress of the United States, or something done pursuant thereto, could extinguish the life of a Pennsylvania corporation, without Pennsylvania's consent, just as it would be derogatory to the rights and dignity of the United States for the courts of that sovereignty to hold that an act of a state legislature, or something done pursuant thereto, could, without the consent of the United States, extinguish the life of a corporation which the United States had called into being.

We conclude that when a state bank consolidates with a national bank located in the same county, city, town, or village, pursuant to the Acts of Congress authorizing such a consolidation, the charter of the state bank is not thereby extinguished and the state corporation is not thereby dissolved. Pennsylvania could by appropriate legislation provide that under such circumstances a state bank is ipso facto dissolved and it might be expedient so to provide, but this court cannot, under the guise of a judicial decision, enact such legislation. The charter of the Northampton Trust Company still exists and the company still maintains in contemplation of law its corporate personality. Its petition praying for dissolution under the Pennsylvania Act of April 9, 1856, P. L. 293, should have been granted.

The decree appealed from is reversed, and the record remitted that a decree of dissolution may be entered in accordance with the prayer of the petition.